## SCARING & CARMAN PLLC
ATTORNEYS AT LAW
SUITE 501
666 OLD COUNTRY ROAD
GARDEN CITY, N.Y. 11530-2004

(516) 683-8500

FAX
(516) 683-8410

STEPHEN P. SCARING, P.C.
SUSAN SCARING CARMAN

MATTHEW W. BRISSENDEN
OF COUNSEL

sscaring@scaringlaw.com
scarman@scaringlaw.com

November 18, 2021

**Via ECF and Email**

The Honorable Mary Kay Vyskocil
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

    Re: *United States v. Kristian Rhein*
       20-CR-00160

Dear Judge Vyskocil:

  This office represents the Defendant Kristian Rhein in the above-captioned matter. On August 3, 2021, Mr. Rhein pled guilty to a one-count superseding information, charging him with a violation of 21 U.S.C. § 331. He is scheduled to appear before Your Honor for sentencing on January 5, 2022.

  Pursuant to the plea agreement, Mr. Rhein and the Government have stipulated to a total offense level of 33 under the United States Sentencing Guidelines. The parties further stipulate that the Defendant's advisory Guidelines sentence under the circumstances is 36 months, the statutory maximum sentence pursuant to 21 U.S.C. §§ 331 and 333(a)(2).

  On October 28th, The United States Probation Department filed its Presentence Investigation Report and Sentencing Recommendation, in which Probation recommends a sentence of 36 months, as well as a $50,000 fine.

  We are writing in advance of sentencing to provide the Court with background information concerning the Defendant, and to respectfully ask the Court to consider a sentence below the statutory maximum.

1

SCARING & CARMAN PLLC

I. **Character Letters**

Attached hereto as Exhibit A are character letters which we have received from Mr. Rhein's friends and family members. We would respectfully ask Your Honor to consider such letters, and the information contained therein, in crafting a sentence which is sufficient, but not greater than necessary, to ratify the policy objectives of 18 U.S.C. 3553(a). Specifically attached hereto are letters from the following individuals:

Courtney Rhein (Defendant's Wife)
Christina and Robert Rhein (Defendant's Parents)
Michael Connolly (Defendant's Employer)
Rev. Lynn A. Sullivan (Pastor)
Kimberly F. Pauley (Family Friend)
Janine Grech (Volunteer at Island Harvest)
David Duggan (Horse Trainer)
Dr. Brady J. Bergen (Professional Colleague)
Thomas & Melissa Eschmann (Family Friends)
Rev. Dr. Ian Rottenberg (Pastor)
Adam Duff (Family Friend)
Ann D. Kegley (Defendant's Mother-in-Law)
Alison & Andrew Carey (Family Friends)
Jena Antonucci (Horse Trainer)
Lisa & Tim Goettelmann (Family Friends)
Javier and Abby Castellano (Horse Jockey, Family Friends)
Jeanine & Michael J. Borrelli (Family Friends)
Kirk & Cynthia Dupps (Defendant's Aunt and Uncle)
Edward Howard (Family Friend)

II. **Defendant's Background**

Kristian Rhein was born on June 5, 1972 in Cincinnati, Ohio. The Defendant's father, Robert, worked as a printer. His mother, Christina, stayed home in order to rear Kristian and his older sister Arlene, while also taking a variety of odd jobs to help supplement the family's income.

When the Defendant was five, his family moved from Ohio to Connecticut, where they lived for a time in a series of rented houses. The young family struggled, however, with the high cost of living in Connecticut. As a result, when Mr. Rhein was in 5th grade, they relocated again to a small town in North Carolina.

SCARING & CARMAN PLLC

The family's new home was located in a rural, but not particularly affluent, area situated directly next to a trailer park. Nevertheless, Kristian was fascinated with his new bucolic surroundings, and especially enjoyed the newfound proximity to animals, including horses. He quickly made new friends in church and school, where he excelled at both academics and athletics. At an early age, Kristian helped organize the area's first travel soccer team, an early and lifelong passion.

At age 15, the Defendant took a job working as a part-time assistant at a local veterinary practice which treated all variety of animals, from horses to house cats. It was a formative experience for Mr. Rhein, who would return to work at the clinic year after year throughout high school and college. Over time, as he grew in experience, his responsibilities at the clinic steadily increased.

The Defendant attended the University of North Carolina at Chapel Hill, where he majored in biology and played soccer. At this point, the idea of becoming a veterinarian had become increasingly intriguing, but Kristian was also daunted by the high cost and competitive nature of the application process; given the small number of veterinarian programs, the admissions process is notoriously selective. For Mr. Rhein – whose parents had not even finished college – the prospect of being accepted into veterinarian school seemed an intimidating long shot.

Hence, upon graduating from college, Mr. Rhein did not immediately apply. Instead, he returned home in order to work at the local clinic as a vet technician for another two years. In addition to providing a wealth of hands-on experience, those two years cemented his desire to become a veterinarian.

As a result, the following year, Rhein moved to Raleigh and began the application process for the veterinarian program at North Carolina State. In 1997, he was accepted into that program and began attending classes. While the Defendant parents had helped to pay for undergraduate college, Mr. Rhein insisted on paying for graduate school on his own. To do so, he worked multiple jobs – as a teaching aid, a lab assistant, and a soccer coach. When money became tight, Mr. Rhein sold his car for the extra funds, and biked over five miles to school each day. Despite the demanding schedule and long hours, Kristian excelled, earning multiple academic scholarships throughout his four years of veterinarian school.

Mr. Rhein's excellence was recognized when he obtained a highly sought-after internship at the Rood & Riddle Equine Hospital in Lexington, Kentucky – widely considered to be the best equine facility in the country. Indeed, the Defendant was only the second student from North Carolina State to ever be offered such a prestigious position. It would prove to be an incredibly intense and invaluable learning experience. Mr. Rhein spent many nights on call, assisting in

back-to-back emergency surgeries; at times he would be unable to sleep for 72 hours. Brady Bergen, a fellow veterinarian who interned with the Defendant at Rood & Riddle recalls this time in his letter to the Court:

> We spent many long days and late nights operating on, monitoring and treating numerous equine patients. It was a very demanding first year in practice and our intern group got to know each other well. Kristian was one of the most dependable and skilled in our group. It didn't matter how overwhelmed he was, he would always step in where help was needed. He not only worked hard, but he also knew when to keep things light and keep everyone around him smiling. He treated everyone from the barn crew, reception, support staff, doctors and owners with the utmost respect and dignity.

*See* letter from Dr. Brady Bergin, attached hereto at Exhibit A.

It was at Rood & Riddle that Kristian met Courtney Kegley, his current wife. At the time, Courtney was working as a vet technician, while studying animal science and pursuing her MBA at the University of Kentucky. The two began dating and quickly became inseparable. Courtney introduced Kristian to her parents, who were also living in Lexington. In short order, the Kegley's became a surrogate family to Mr. Rhein, and he spent most of his free time in their company.

When the Defendant finished his internship in 2003, he accepted a position working for James Hunt, a veterinarian with a practice at Belmont Park. Courtney moved with Kristian to New York. Originally, the couple lived in a small apartment in a dilapidated neighborhood near the track. Courtney, who knew no one in the New York Area, found the transition from the rolling hills of Kentucky to be especially difficult.

At Belmont, however, Rhein was privileged to work with some of the best horses and most successful trainers in the world. And he quickly began to develop a reputation as an exceptionally talented young veterinarian, who had a deep and quiet connection with the animals he treated. As one trainer relates:

> For years I watched Kristian Rhein work from afar and was always impressed with his attention to detail and genuine care for the horse. My impression was always that he wanted to figure out how to best help the horse.
>
> After observing for several years, I asked Dr. Rhein to evaluate some difficult specialty cases and was always pleased with his soft demeanor and connection with the horse. It didn't matter how complex the issue may be, he would

painstakingly uncover each stone until we had reached a proper diagnosis and plan to safely move the horse forward. Being that I was married to an equine veterinarian previously, I personally understand how much pressure an equine vet can be under to have answers immediately for impatient owners and trainers alike. This was not anything I have ever experienced with Dr. Rhein. He always maintained patience and a willingness to work at solutions, not band aids that could harm the horse.

*See* letter from Jena Antonucci, attached hereto at Exhibit A.

In 2004, Kristian and Courtney moved to a slightly nicer neighborhood in West Hempstead, and the following year they were married. In 2007, their first daughter, Sophia, was born, followed by Sydney in 2008. That same year, the family was able to buy a home in Garden City. As a young mother, Courtney began meeting more people and started to feel more at home in the Long Island area.

Over the next five years, Mr. Rhein continued to excel at this job, and demand for services grew. As a devoted and passionate veterinarian, he was thrilled to be working in this elite environment. Moreover, his growing success allowed him to provide for his loved ones. When the 2008 recession hit, Mr. Rhein's hometown in South Carolina was devastated. Both his father and mother lost their jobs, and his father began suffering from chronic health issues. Mr. Rhein was able to step in, and pay off his parents' mortgage, so that they could remain in their home.

But this success came at a steep cost for the Defendant and his young family. Mr. Rhein's working day began at 4:00 am every day and did not end until 6:00 or 7:00 in the evenings. On most nights, he could do little more than eat his dinner before going to bed. Worse yet, it was unrelenting. Rhein was expected to be at the track literally seven days a week, as well as on holidays. Every year, he would go to the track to see horses on Thanksgiving as well as on Christmas morning. Still, the Defendant found ways to make time for his family. When he was unable to attend Sunday services with his young girls, Mr. Rhein began taking them to church with him on Wednesday evenings. *See* letter from Pastor Lynn Sullivan, attached hereto at Exhibit A.

The Defendant obtained a reputation for being exceptionally skilled at keeping his horses healthy, and he prided himself especially on preventing and treating lameness in his animals. The "breakdown" rate of Rhein's horses was exceptionally low. As one such trainer attests in a letter to this Court:

SCARING & CARMAN PLLC

> Dr. Rhein practiced on my horses for over ten years, he was one of the most brilliant vets I have encountered in the thirty years I have been in the racing industry. I can even quote from his ex-employer, Dr. James Hunt, as saying he was the most talented young vet he had on staff. I found Dr. Rhein to be very precise at diagnosing lameness and taking the time to figure out the root problem of the horse. Dr. Rhein's approach . . . was very professional and his priority was always the well being of the horse.

*See* letter from David Duggan, attached hereto at Exhibit A.

As his reputation continued to grow, the Defendant's services were sought out by ever more successful trainers, to work on even more famous (and expensive) horses. This, in turn, meant more pressure to succeed.

### III.     Relevant Medical History

In 2010, Mr. Rhein's life as he knew it took a dramatic turn, after doctors discovered a large mass in his testicles. After an initial surgery, doctors told the Defendant that the mass was benign, and he once again threw himself into his work. In 2013, however, he began feeling pain in his kidney area. Subsequent scans confirmed Stage IIIA non-Hodgkin's lymphoma. Doctors told Mr. Rhein that this cancer had metastasized throughout his body, with masses in his intestines, his neck, inside his scapula, near his heart, and attached to his trachea. They told him that his cancer was close to, but not yet quite at, the point of no return. As a result, Rhein commenced immediately with a brutalizing course of chemotherapy.

Because the Rheins did not have disability insurance, and because Kristian's employer would not pay him for time away from the track, the family's income plummeted, to the point where Kristian and Courtney feared they would lose everything. Mr. Rhein was receiving chemotherapy treatments every three weeks; during week one, he would receive daily courses of chemotherapy; during week two, he would be too weak to move. During week three, he would return to the track, in order to work his regular shift of 4 to 6. And then he would start all over again.

In early 2014, after 4 cycles of chemotherapy, the Defendant was given to understand that he would need to undergo two separate surgical procedures. During the first surgery, doctors removed the scapular mass, a golf-ball sized growth in his neck, and the mass attached his trachea and heart. In order to complete the procedure, doctors were required to separate his ribs, to gain access to his trachea. As one can imagine, the pain was terrifying, and beyond anything that Mr. Rhein had ever experienced.

SCARING & CARMAN PLLC

Following this harrowing experience, Mr. Rhein was told that he would be required to recover as quickly as possible so that doctors could go in a second time, to address the cancer throughout his abdomen. And so, 30 days later, he was back in surgery again. This time, doctors opened him from his breastbone to his pubis, removing cancerous nodes throughout his intestinal track. The recovery process from this second procedure was even more excruciating than the first time. And yet, after these two agonizing procedures, Kristian and his family received the crushing news that the cancer was *still* present. As a result, Mr. Rhein was once again thrust back into additional rounds of chemotherapy, each of which was more difficult than the last.

At the end, however, Kristian's family finally received the news they had been praying to hear – his cancer was in remission. Today, Mr. Rhein is blessed to be healthy and strong; however, for Kristian and his family, the underlying fear of a recurrence never truly goes away. He continues to receive annual check-ups at Memorial Sloan Kettering. We have attached a letter from Mr. Rhein's treating physician, Dean Bajorin, dated November 17, 2021 (attached as Exhibit B-1), which summarizes his relevant history. Dr. Bajorin writes:

> This letter certifies that Kristian Rhein is under my care for a history of testicular cancer. On 10/1/2010, he underwent a removal of the right testicle due to the suspicion of testicular cancer. That surgical specimen did not show active cancer, rather an area of cellular debris highly suggestive of a testicular cancer that had undergone spontaneous total regression. His evaluation at that time showed no metastatic disease so he was placed on a surveillance protocol.
>
> Unfortunately, in 2013 his cancer returned with metastatic disease identified in lymph nodes in the back of the abdomen. Once the recurrence was detected, he received four cycles of chemotherapy (cisplatin and etoposide) from 10/7/2013-12/13/2013. At the completion initial chemotherapy, he was found to have responded with shrinkage of his cancer but he still had suspicious residual disease on his CAT scans. Consequently, on 3/5/14 he underwent a retroperitoneal lymph node dissection, a surgical procedure which is an extensive and meticulous removal of the lymph nodes behind the abdominal cavity. The pathology specimen from that procedure showed a total of 65 lymph nodes, some of which still had residual trophoblastic (testicular) tumor, thus requiring treatment with two additional cycles of chemotherapy which were administered from 4/14/20 to 5/16/14.
>
> Testicular cancer multimodality treatment of chemotherapy, followed by extensive surgery to remove lymph nodes, followed by more chemotherapy is considered curative and he has been in remission since 2014. Since completing

treatment in 2014, he continues to be followed with active surveillance for possible disease recurrence, either from his prior disease or from a new tumor arising in the remaining testicle. Presently, he is on an annual evaluation schedule which includes a physical exam, blood tests (including testicular cancer tumor markers), and a chest x-ray. The last evaluation was performed in July 2021 at which time he had no evidence of cancer; our approach is to continue these annual evaluations for 10 years after completion of therapy.[1]

Mr. Rhein has sought to harness his experience in order to help others going through similar ordeals. As the Reverend Ian Rottenberg attests in his letter to this Court:

> During my work with the church, three other members who had some similarities with him in terms of age and family received difficult cancer diagnosis. Knowing his experience and perspectives, I asked Kristian whether he might be willing to help me lead a small faith-based discussion group for these members, on the topic of cancer and healing. He immediately agreed, and his work with that group had an even more positive impact on the lives of the participants than I could have hoped. This was due to the fact that Kristian shares so generously of himself and from his experience. He didn't preach or lecture, or claim to have particular wisdom. Rather, he freely made himself available to those who were suffering, and stood by them as they received treatment.

*See* letter from Reverend Ian Rottenberg, attached hereto at Exhibit A.

### IV. Offense Conduct

In 2011, the Defendant's father-in-law, Michael Kegley Sr., whom Kristian loved dearly and trusted implicitly, introduced him to what he described as an up-and-coming company called Medivet. At the time, Medivet was promoting a treatment called Autologous-Conditioned Serum, or ACS. ACS treatment involves the removal of a blood sample from the treated horse. Such samples are then processed to remove red and white blood cells, before being readministered as a serum to the same animal. This treatment was being promoted (and continues

---

[1] Mr. Rhein's medical records from Memorial Sloan Kettering were obtained by counsel after the probation report issued; they have since been provided to Probation and the Government. Those records are over 1,800 pages in length and can be made available to the Court upon request. I have reviewed the hospital records and am attaching the following as Exhibit B-2: Pre-Surgical Notes, dated January 16, 2014 (4 pages) from Manjit S. Bains, M.D. of MSK; Note, dated January 16, 2014 (1 page) from Joel Sheinfeld, M.D. of MSK; Discharge Summary, dated February 5, 2014 (2 pages) from Manjit S. Bains, M.D. of MSK; and Discharge Summary, dated March 5, 2014 (2 pages) from Manjit S. Bains, M.D. of MSK.

to be used) as a drug free alternative to cortisone, in order to treat joint injuries and osteoarthritis.[2] Mr. Rhein was impressed with the results of ACS treatment.

The Defendant ultimately became involved as a 25 % owner of Medivet Equine, along with Michael Kegley Sr., who also owned 25%, and a third individual who owned the remaining 50% stake.

In subsequent years, Medivet began selling a second product called SGF-1000, which was obtained from a company in Australia. SGF-1000 was reportedly derived from purified ovine placentas and was marketed as containing "growth factors" that could "promote faster, more complete healing and recovery from training and injury, resulting in increased general health and wellness." Mr. Rhein began using SGF-1000, and promoted its use to trainers and other veterinarians, despite the fact that it was not approved by the Food and Drug Administration.

As SGF-1000 began to receive increased scrutiny from the horse racing industry as an unregulated substance and possible performance enhancing substance, Mr. Rhein continued to provide the substance to his horses and trainers, while falsely billing it under "other services."

Mr. Rhein acknowledges and accepts responsibility for his misconduct, and for violating the duty of trust which he owed to both his equine patients, their owners and the racing industry.

### V.     Arrest, Guilty Plea, and Post-Offense Conduct

In March of 2020, Kristian Rhein was arrested and charged in connection with the instant case. He pled guilty to the superseding information on August 3, 2021, without filing motions to suppress or dismiss. Mr. Rhein was only the second defendant (after his brother-in-law, Michael Kegley), to enter a guilty plea.

Mr. Rhein is no longer a practicing veterinarian; subsequent to his arrest, he agreed to the voluntary suspension of his license. Upon entry of judgment, it will be revoked by the New York State Office of Professional Discipline. As a person who has always defined himself as an animal lover and a devoted veterinarian, these charges and the attendant publicity have come as a profound personal blow for Mr. Rhein, causing him to deeply question his own actions. The reputation which he built through so many painstaking hours of sacrifice and hard work is now in tatters. What is more, Mr. Rhein realizes that he violated a profound duty of trust, by treating the animals under his care with non-regulated substances. In discussions with the undersigned counsel, Mr. Rhein has described living under a "cloud of shame" and attributes his conviction to the product of his own "hubris." As his wife, Courtney Rhein, writes in her letter to this Court:

---

[2] *See*: https://largeanimal.vethospitals.ufl.edu/hospital-services/equine-lameness/irap-therapy/

9

> The incident stands in such stark contrast to how Kristian had lived his life and it has put an overwhelming sense of disappointment in letting down both people who relied on him in a professional capacity and those of us who relied on his integrity in a personal capacity. The guilt keeps him up most of the night, I have helped him to find a therapist and he is continuing to do his best to be the best person he can be.

*See* letter from Courtney Rhein, attached hereto at Exhibit A.

While Mr. Rhein deeply misses his role as a caregiver for animals, he has also expressed a sense of relief, as his arrest and conviction have required him to step back from hyper-competitive and personally corrosive world of professional horse racing. Kristian has sought to take stock of his life and what matters most, including his marriage, his children, his health and his faith. He has also reconnected with his lifelong passion for soccer, by coaching young players in the community. As Courtney writes:

> Our family is and always has been Kristian's top priority and that has never wavered not even for a second. Since March of 2020 he has used every ounce of his being to be the best father, husband and son he could be. He has not let self-pity or anger overcome him, he has instead turned the focus on helping others and loving our family. Kristian has been coaching the youth soccer players in our community daily, he has helped at our church weekly and at the local food banks. Kristian lives with his whole heart and gives of himself without stipulations. He is a source of strength, positivity and encouragement for everyone who knows him.

*Id.*

Mr. Rhein's coaching activity – which began as a volunteer endeavor – has since morphed into a job with an organization called Soccer Motiv8. Michael Connolly, the director of that program, writes in his letter to the Court:

> I have known Dr. Kristian Rhein for almost 10 years. His daughters came through soccer Motiv8 as players. Dr. Rhein loved the program and volunteered to help in his spare time and put his love of soccer and personal experience to use with the community youth. At the time we were only familiar acquaintants with a mutual love of soccer and especially coaching. I came to know him as a dedicated husband, excellent father and all around good person.

> Fast forward to May 2020, I asked him to officially join Soccer Motiv8 as a coach. What started as a volunteer position transitioned into a part-time hobby and now nearly a full-time job. He is known as Coach K to our program and to our kids. His passion, dedication and caring for the children and our Motiv8 families has been genuine. Children have responded to his training style and parents have reached out to me with praise for his work. I have witnessed the character, growth and professionalism of Coach K firsthand and I can attest to his love of the game and how much he is giving back to these children and our town. His efforts through our program have positive immediate returns yet they are impacting the future of these families and our community. He is not only teaching soccer but he is showing these children how to be good people. Dr. Rhein has grown over the last few years and I am grateful and proud to witness it.

*See* letter from Michael Connolly, attached hereto at Exhibit A.

The Defendant has also used his newfound free time to re-engage in volunteer work through his church and other charitable organizations. Growing up, community service – from Habitat for Humanity to Meals on Wheels and mission work – was always part of Kristian's life. While working at the track, both he and Courtney tried to fit in good works where they could – through donations to Anna's House (which supports the children of immigrant track workers), food drives, and church events. However, Mr. Rhein's demanding work schedule prevented him from spending as much time volunteering as he had in the past.

Over the past two years, in a search for purpose and meaning, the Defendant has quietly recommitted himself to this type of work. Among other things, he works at Island Harvest, collecting, sorting, and delivering food to persons in need. During peak covid, Mr. Rhein was spending at least one day a week doing this work; now that the level of need has subsided somewhat, he continues to volunteer at Island Harvest bi-weekly. He reports that seeing the level of deprivation and suffering which exists in his own community has helped to put his own problems into perspective.

Mr. Rhein also volunteers biweekly at the Long Island Council of Churches food pantry in Freeport and has spent the past two summers growing food for those in need through his church's community garden. Kimberly F. Pauley, the widow of the late William H. Pauley III, and a long-time family friend, described the Defendant's involvement in her letter to the Court:

> For the past 10 years I have been a leader in our church's service project, the Giving Garden. We provide hundreds of pounds of organically grown fresh vegetables to the Mary Brennan INN soup kitchen in Hempstead, NY. Over the

years, due mostly to retirement the number of volunteers has dwindled. The number of hungry, unfortunately, has dramatically increased.

Last year, the COVID crisis hit New York during the crucial spring/early summer planting season. People were afraid to be outside with others. I had no idea how I was going to plant the garden alone. Fortunately, I wasn't. Kristian and his family bravely joined me and together we planted, weeded and tended the garden. Four hundred and thirty pounds of desperately needed produce were donated to the INN.

Gardening is hot, sweaty work, short on glamour. It is a behind the scenes act of kindness and charity. Kristian's willingness to quietly do what needs to be done to help others without fanfare reveals his true character.

My nannie always told me, "It is the end of a good day when you can say I helped someone other than myself." Kristian Rhein has had many good days.

*See* letter from Kimberly F. Pauley, attached hereto at Exhibit A.

Janine Grech, lead volunteer with Island Harvest, writes:

I have had the pleasure of working with Kristian Rhein from the beginning of this pandemic and would be happy to speak of his character as a person and a friend. It is not uncommon for people to feel stressed and troubled during these uncertain times and let that worry and stress affect their performance in their work or in their volunteering duties. This was not so with Kristian. He came to our site on time and with an eager sense of duty. He never hesitated to offer help to those who were physically unable to lift the weight of their food packages, offering to walk them to their apartments (which was often a trek up stairs and into different buildings). He followed direction well and never complained about the many trips with heavy boxes and bags to the 5 buildings we deliver to.

*See* letter from Janine Grech, attached hereto at Exhibit A.

### VI. Request for a Below-Guidelines Sentence

#### A. Probation's Sentencing Recommendation Violates U.S.S.G. § 5G1.1 (a)

The parties in this case have entered into a plea agreement which required Mr. Rhein to plead guilty to a violation of 21 U.S.C. § 331, an offense that carries a maximum sentence of 36

months. The parties also stipulated to total offense level of 33, and a Criminal History of Category I. If the offense of conviction carried a higher statutory penalty, that offense level would result in an advisory sentence of 135-168 months. Based upon this fact, Probation is advocating for the Court to impose the statutory maximum sentence. Indeed, Probation's sentencing recommendation states:

> The substantial loss amount and the defendant's role in the instant offense calculates an advisory guidelines range that greatly surpasses the statutory maximum term of imprisonment. It appears he is not being held for the entirety of his criminal conduct as calculated by the Guidelines. We believe that the defendant warrants the maximum sentence permissible by statute and respectfully recommend 36 months' imprisonment to satisfy the sentencing objectives of promoting respect for the law, deterrence and punishment.

Probation Report and Sentencing Recommendation at p. 32.

To begin, it is important to note that the defendant sentencing guidelines are enhanced by 22 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(L) as a result of the loss which is calculated at $53,586,521. The loss does not represent the value of illegal drugs sold by the defendant; rather, it represents the 2017-2020 winnings for Jason Servis, Jorge Abreu, Jeremiah Englehart and Thomas Albertrani, none of which was shared with the defendant. Further, Probation's advice to this Court is contrary to well-established law, and if adopted, would amount to plain error. Pursuant to U.S.S.G. § 5G1.1 (a), "where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, *the statutorily authorized maximum sentence shall be the guideline sentence.*" (Emphasis added). This means that, in the instant case, the applicable recommended Guidelines sentence is 36 months. It is *not* 36 months with an asterisk next to it. It is 36 months, *full stop.* As a result, considering 135-168 months as the "real" Guidelines, or as the baseline for setting the Defendant's final sentence, is clearly improper.

Indeed, the Second Circuit Court of Appeals has repeatedly made this point. Hence, in *United States v. Bennett*, 839 F.3d 153 (2d Cir. 2016), it found plain error where a District Court repeatedly referenced the Guidelines range which *would have* applied, but for the applicable statutory maximum. Even though the District Court asserted that it was not relying upon such Guidelines to sentence the defendant, the Circuit found prejudice, because the District Court's repeated reference to the would-be Guidelines "may well have anchored the District Court's thinking as to what an appropriate sentence would be." *Id.* at 163. As the Circuit explained, "[t]his is because the Guidelines are not only the starting point for most federal sentencing proceedings but also the lodestar. Indeed, even if the sentencing judge sees a reason to vary from the Guidelines, if the judge uses the sentencing range as the beginning point to explain the

decision to deviate from it, then the Guidelines are in a real sense the basis for the sentence." *Id.*, citing *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016); *see also United States v. Dorvee*, 616 F.3d 174, 181 (2d Cir. 2010) (finding sentencing error where "the Guidelines sentence was not 262 to 327 months, it was the statutory maximum . . . Yet the district court continued to treat 262 to 327 months as though it were the benchmark for any variance.").

In short, the recommended Guidelines sentence in this case is 36 months. The "would be" range of 135-168 months should not exercise a gravitational pull that effects this Court's determination of the Defendant's final sentence. Indeed, it should not be considered at all.

  **B.**  **The 18 U.S.C. 3553(a) Factors Support a Non-Incarcerative Sentence**

As set forth above, the recommended sentence under the United States Sentencing Guidelines is 36-months' incarceration. As this Court is well aware, however, the United States Sentencing Guidelines are merely advisory. *United States v. Booker,* 543 U.S. 220 (2005). Although they represent the starting point of the Court's analysis, they should not be treated as presumptively reasonable for any given offense. *Gall v. United States*, 552 U.S. 38, 50 (2007).

Instead, sentencing requires the Court to make an individualized assessment of "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Having given due consideration to these factors, the "parsimony provision" of § 3553 directs the Court to impose a sentence which is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." This includes the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.
> Finally, § 3553 further directs the Court to consider:
>
> (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established…by the [sentencing] guidelines…; (5) any pertinent policy statement [of the Sentencing Commission]; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

*See* 18 U.S.C.A. § 3553 (a)(3)-(a)(7).

SCARING & CARMAN PLLC

Importantly, "[t]he district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring).

In this case, we respectfully submit that an individualized consideration of the Defendant's background makes it clear that a sentence of incarceration is not necessary to deter Mr. Rhein from committing further crimes, or to protect the public. To the contrary, Mr. Rhein is by all accounts an asset to both his community and his family. He has, with the exception of the instant offense conduct, endeavored to lead a good life. Indeed, the same themes are repeated again and again in the character letters submitted by those who know the Defendant best. Those letters paint a clear picture of a loving and devoted father and husband, a person of sincere faith, a patient and encouraging coach, and an individual who has earnestly tried to make his community a better place. As one such letter notes:

> We can always count on Kristian to help us, whether it is volunteering his time to collect food for our local food pantry, dropping off bags of clothing donations to neighborhood churches or helping countless kids in our town pursue their passions of soccer. He has proven to be a person that we can trust with our kids and someone we can go to for guidance in raising our 4 children. Kristian has personally coached two of our daughters. He has given them such confidence in themselves, something that pre-teen girls sadly lack. His belief in them has made them strong girls on the field and off. He is man that strongly believes in faith and family. He has such a strong bond with own two daughters, Sophia and Sydney. They care so deeply about him and he is a big reason that his daughters are the smart, kind and thoughtful young women they are.

*See* letter from Lisa and Tim Goettelmann, attached hereto at Exhibit A.

Mr. Rhein has accepted responsibility, while experiencing a profound sense of remorse for his conduct. He is a true "first offender," who – at age 48 – had never even been arrested, much less convicted of a crime. Studies conducted by the United States Sentencing Commission demonstrate that true first offenders like Mr. Rhein are extremely unlikely to reoffend – only 2.5% of so called "first offenders" are ever convicted of a second offense. *See* Recidivism and the First Offender, Exhibit 6 (United States Sentencing Commission, May 2004).[3]

Moreover, the Defendant has already paid an extremely high price for his offense. Mr. Rhein's lifelong passion has been veterinarian medicine; it is a dream that he has been pursuing since he was literally 15 years old. The hours and days that he sacrificed in pursuit of that dream

---

[3] https://www.ussc.gov/research/research-publications/recidivism-and-first-offender

15

SCARING & CARMAN PLLC

are probably incalculable. And now all of that is gone, as is the sterling reputation which he worked so hard to build. Mr. Rhein has lost more than his just his livelihood, he has lost his very identity.

Worse yet, the secure life which he created for his wife and two daughters is in shambles, as the family faces likely financial ruin. As part of his plea, Mr. Rhein has agreed to pay $729,716 in restitution, and an additional $1,021,800 in forfeiture. Pursuant to the plea agreement, a forfeiture payment of $671,800 is due at sentencing. In order to satisfy that obligation, the Rheins are mortgaging their home. According to the Probation report, the Rheins' monthly net income is currently a *negative* $16,145 per month. Should Mr. Rhein be incarcerated, it will be tremendously difficult for his wife – who is currently working as a teacher's aide – to make the resultant monthly mortgage payments.

Mr. Rhein accepts all of these consequences as the and fair and necessary result of his offense conduct. But it is difficult to imagine that other, similarly situated veterinarians, surveying the wreckage of Mr. Rhein's life, would somehow come to the conclusion that he had "gotten off easy," or that crime pays.

### C. Mr. Rhein's Medical History Involving Stage IIIA Cancer Represents a Mitigating Factor Which the Court Should Consider

We would respectfully ask this Court to consider Mr. Rhein's health, and the real and ever-present threat of a cancer recurrence. As his wife writes in her letter to the Court:

> The unsurmountable stress of his impending sentencing and his feeling of guilt combined with his lack of rest have made me petrified that his cancer will relapse. It is a thought that is always on the minds of both myself and my daughters on a daily basis; as it is something that we can only control by limiting stress and being vigilant about follow up cancer screenings.

*See* letter from Courtney Rhein, attached hereto at Exhibit A.

This is not an idyl or unreasonable worry; multiple studies have demonstrated a link between stress levels and the likelihood of a recurrence among cancer survivors. *See* National Cancer Institute, *Study Suggests a Link between Stress and Cancer Coming Back* (January 14, 2021)[4]; National Institutes of Health, *Stress May Awaken Dormant Cancer Cells* (December 20,

---

4  https://www.cancer.gov/news-events/cancer-currents-blog/2021/cancer-returning-stress-hormones

16

2020).[5] Moreover, such stress levels are also associated with more aggressive growth and worse prognoses. As one expert has explained:

> "Chronic stress creates something of a perfect storm where precancerous cells can grow and flourish," says Ankur Parikh, DO, Medical Director of Precision Medicine at Cancer Treatment Centers of America (CTCA) . . . "What we're finding is that when you're stressed, your body releases a surge of hormones, including adrenaline and cortisol, that triggers various inflammatory responses," Dr. Parikh says. "When you're in a constant state of psychological stress, those triggers don't shut off, which could lead to chronic inflammation and, potentially, cancer growth or cancer metastasis." . . . In patients who already have cancer, studies have found that stress is linked to tumor growth. "We know that high-stressed cancer patients tend to have a harder time in treatment and recovery, and it makes sense that cancer might be harder to treat or more aggressive in these patients," Dr. Parikh says.

Cancer Treatment Centers of America, *What is the Relationship Between Stress and Cancer?* (July 9, 2019).[6]

### D. Probation's Recommendation of a Fine

Given the already crushing financial consequences of forfeiture and restitution, and the limited finances that the defendant and his wife will have left, we ask this Court not to impose an additional financial burden on the defendant in the form of a fine.

---

[5]  https://www.nih.gov/news-events/nih-research-matters/stress-may-awaken-dormant-cancer-cells
[6]  https://www.cancercenter.com/community/blog/2019/07/what-is-the-relationship-between-stress-and-cancer

17

SCARING & CARMAN PLLC

## VII. Conclusion

The defendant will address the Court at sentencing. He will make no excuses for his conduct and will demonstrate complete acceptance of responsibility. We are asking this Court to consider imposing a sentence involving probation with home detention and electronic monitoring, together with a significant community service requirement. We respectfully submit that, given the mitigating factors we have outlined in our submission, such punishment, combined with the agreed-upon forfeiture and restitution, would be sufficient, but not greater than necessary to satisfy the policy considerations set forth in 18 U.S.C. § 3553.

Respectfully submitted,

STEPHEN P. SCARING

cc: AUSA Andrew Adams (by ECF)
AUSA Benet Kearney (by ECF)
AUSA Sarah Mortazavi (by ECF)
AUSA Anden Chow (by ECF)
Probation Officer Jemmard Thomas (by email)